20-1339 from the Southern District of Iowa, Hallmark Specialty Insurance Company v. Phoenix C & D Recycling. Very well. Mr. Jones, we'll hear from you first. Thank you, Your Honor. I would reserve five minutes of time for a rebuttal. May it please the Court, as counsel for Phoenix C & D Appeal presents issues regarding an insurance company's alleged reliance on the experts it hired. And I think this case presents two interesting fact scenarios in that the issues for appeal involve, in one case, where the insurance company, Hallmark, asserts that it an accounting expert, but then also we have a situation where when it came to the equipment, the valuation and payments for the equipment for the fire damage suffered by Phoenix in a July 6, 2017 loss, the insurance company rejected or at least modified the expert's opinion. So we have, I think, a scope of what is the basis or to what extent an insurance company is entitled to judgment as a matter of law by relying on an expert or also in not relying on an expert. And in regards to the accounting expert, there's a timeline from December of 2017, which I think is very important to understand. First of all, on December 1 of 2017, I as counsel for Phoenix submitted financial statements to Hallmark and also to HSNO, the accounting firm that Hallmark had hired. And then I also had cover letters to both Hallmark and also HSNO accounting explaining our position regarding the business income claim that we were making using the financial statements that were enclosed, which were post-fire financial statements. We had previously provided to Hallmark pre-fire financial statements, including tax returns for multiple years and the profit and loss statements for the first six months of 2017 prior to the fire. So the financial statements that we were providing to were the financial statements that showed the continuing operating expenses, normal operating expenses incurred by Phoenix after the fire. And that's covered by the policy. And I think the fact that the policy provides coverage for continuing normal operating expenses is reflected by the fact that Hallmark did, in fact, issue payment. So they did issue a payment of just over $28,000 about in early January, about a month after we submitted those financial statements. But in addition to the December 1 date in this timeline, there's some significant events that happened later in that month, including my letter or my email to the insurance adjuster at Hallmark. His name is Brian Jones. And I had not heard from Brian Jones for two weeks after I point blank, is Hallmark refusing to pay for the continuing normal operating expenses, including payroll? And I think that the way this timeline plays out, it becomes very important that the focus of the discussion turns to payroll. And ironically, unbeknownst to me, the following day after my email on December 15, the adjuster at Hallmark gets an email from the accounting expert. And the accounting expert is asking for guidance from the adjuster at Hallmark. And he wants to know how to handle the payroll for the calculations of the continuing normal operating expenses that he is calculating. And some time goes by, HSNO issues what it calls preliminary numbers. And the preliminary numbers have some information which I think is a little confusing. Because they include, they're dividing up between continuing and non-continuing expenses. So they're trying to divide up what's in the financial information of Phoenix. And they're trying to, the accountant is categorizing it as a continuing expense, which would be paid by the income of the insurance policy, or a non-continuing expense, which would not be paid by the business income. And so if you look at his report, which is included in the addendum that I have filed, the report has things like workers' compensation is considered a continuing expense. Employee drug testing is considered a continuing expense. And yet the payroll is not categorized as a continuing expense. In fact, it's described as 100% non-continuing. So I think there's some real inconsistencies with these numbers that are in the preliminary report. But by the time he had issued that report on December 20th, 2017, Hallmark had not responded to the accountant's inquiry and what to do with payroll. Finally, the adjuster on December 26th says, oh, yeah, you should include payroll because that's covered by the policy. And I think this is really where you see both the lack of an objective, reasonable basis for the payment that was issued by Hallmark of $28,000, and also the second prong of a bad faith claim, and that is the knowledge of the insurance company that there's no reasonable basis. Because the insurance company, which is certainly, I mean, these people are specialists in adjusting these claims. They know how the policy works. They've said that the policy includes payroll. And yet they don't even wait for a response from the accountant to revise those figures and provide the payroll that the insurance company knew should have been paid at that point in time based on the financial statements that were submitted by Hallmark, or excuse me, by Phoenix. And instead, they issue the check without the continuing payroll. And in fact, there's really no follow-up in the days and weeks after the December 26th email of Brian Jones. There's no communications between the accountant and the insurance company to try to add the payroll figures from the accounting statement or from the financial statements to the amount that Hallmark issued payment for on January 9th. And I also want to talk quickly about the significance of the large loss report. There's a large loss report that was prepared. It's an internal document of the insurance company. We did not see it until this case ended up in litigation. But it's a wealth of information. It's a wealth of information. And one thing that's significant, I think, in terms of the business income claim is that on October 17th, they had already hired the accountant. That the insurance company had already retained this accountant to analyze information because Phoenix had already provided the financial information in the form of tax returns in the first half of the year, profit and loss statements. So Hallmark knew that Phoenix was submitting a business income claim. They had already taken examinations of their oath, which are like depositions from officers at Phoenix. So they're sitting on a wealth of information. And in that large loss report, the Phoenix or excuse me, the Hallmark adjuster, Brian Jones, the same guy who who was asked about the payroll in December, acknowledged that despite the fact that Phoenix had been running at a loss in the financial statements, it was still entitled to the ongoing expenses that it incurred after the loss. So again, this is further evidence that the insurance company knew that Phoenix had incurred a business income loss through its continuing normal operating expenses. And it wasn't just the accountant that knew that. It was the adjuster that knew that. And in fact, the adjuster, as part of that document, that large loss report, actually estimates, and I know it's just an estimate, but he estimated using the documents he had in his possession at that time, a loss of business income of $150,000. There's also this issue of the equipment. And the ironic thing is, when it came to the equipment, they disregarded their experts' opinion. Their expert valued replacement cost of the equipment at $1.2 million. It took a 70% cut for ACV, getting it down to $368,000. But they only paid Phoenix $200,000. And timing was important because Phoenix needed that money. It was running out of that money. Timing was huge. And the fact that Hallmark did not pay these amounts promptly proved devastating to Phoenix. And I would reserve... Hold on. I'm sorry. Yes, Your Honor. Just waiting for you to take a breath. I'm sorry. On the payroll matter, which seemed to be your primary focus at the beginning, Judge Jarvi said, as I understood his ruling, he said, well, yes, they knew that payroll was at issue and it was reasonable for them to not necessarily pay everything that was claimed at the beginning. Is that a correct understanding of his reasoning? And if so, why do you say that was an error? Your Honor, I do not remember that as being part of the reasoning. I remember that the primary, and I think we see in Judge Jarvi's ruling that he repeatedly says that Hallmark didn't have to disregard the HSNO report. And I'm not saying that it had to disregard the report, but I... And there is evidence in the record. We had the deposition testimony of the adjuster who said he didn't question the amounts shown in the financial statements that Phoenix submitted. So I'm at a loss for why the insurance company would question the payroll figures from the post-loss period. And in fact, you know, they concede in their petition. I believe it's on pages, excuse me, complaint on pages 29 at the bottom, page 28 and continuing over on page 29. I believe they can, excuse me, I take that back. It's paragraph 153 of the complaint. It's appendix page 51 where they concede that little or no payroll was included in that payment of $28,000. And so, you know, I just think the situation here and also the adjuster stated that he actually criticized the accountant for not including a 72-hour waiting period. So again, we know from the facts that the adjuster read the report enough to criticize his little or no payroll included in that $28,000. All right. You may reserve the balance for rebuttal. Thank you for your argument. Ms. Weinreich, we'll hear from you. Mr. Jones, you could put your microphone on mute if you would. Will do. Can you hear me, your honors? Yes. You may proceed. Thank you. May it please the court, under well-settled Iowa law, Phoenix has to satisfy both the objective and the subjective prongs of the bad faith standard. Here they satisfy neither of them. First of all, the claim was fairly debatable because it was open to dispute on some logical basis. That's the Iowa Supreme Court in Belleville. Hallmark is entitled to that is irrelevant for purposes of evaluating bad faith so long as there was a debatable issue. All of the items that Mr. Jones argued about below and argued about here are fairly debatable, and I'll tick through a few of them. Obviously, the record is voluminous. I won't do all of them. Very first fairly debatable issue, though, is whether any portion of the business income claim even comes within coverage in the first place. In order to be a viable business income claim, Phoenix has to have lost money because of the fire. Here, Phoenix had been losing money for years. Its machinery had been inoperable for years. Two different regulatory agencies, the Department of Natural Resources, Polk County, had effectively shut it down, said you cannot allow contractors to keep dumping their debris here, which was the principal way that Phoenix made any money. It had something like 18,000 tons of biofuel on its property, but no market to sell it. It was being kicked off the property because the new owner didn't want it there. It owed a million dollars in back rent, etc. None of that had anything to do with the fire. It all predated the fire. So at a minimum, it was reasonably debatable whether they had a viable business income claim in the first place. The second obviously fairly debatable claim was whether Phoenix had any net profit, for the same reasons that I just kicked off. They didn't have any net profit. They don't satisfy essentially the first step of a viable business income claim. The third fairly debatable issue is the one that Mr. Jones was just talking about, which is payroll. A payroll under the policy is not a freestanding category of damages. Payroll is a subset of continuing normal operating expense. Now what Phoenix was paying its crew to do was to break down and move its machinery and at least one of its buildings because it was getting kicked off the land because the new owner didn't want them there. Aside from the lack of causation with the fire, breaking down everything you own and moving down the street is not part of continuing normal operating expenses, unless you're a mash unit or something. It's a one-off. You don't do that all the time. It's not part of continuing normal operating expense, which means it's not payroll. Word payroll in the policy, obviously the policy is written in plain terms, but there are limitations. The way any company might issue payroll to the people that work for it doesn't necessarily mean it qualifies for coverage under the policy. Now we get to... Let me ask one question on that. Yes, sir. If a business decides to move locations and part of what the employees have to do is undertake the move, that's not a normal operating expense? It may be a normal operating expense, but unless it was caused by the property damage of a fire or a flood or a windstorm, it's not a business income loss in the first place. You need to have some property damage that impairs your ability to make money the way you had been making money and then we evaluate, well, what was your normal operating expenses and what was your payroll for that? So you're saying that the move would have to be related to the fire? Yes, sir. Yes, sir. They're not insured for their poor business practices that causes regulatory agencies to shut them down and bankruptcies and all that. Those are not insurable events. Those are how businesses conduct themselves, sometimes well, sometimes not so well, but it doesn't make it an insurable claim. What sort of payroll would be insurable under the policy? Sure. So for example, if the work that they were doing, say the buildings as they were here were partially damaged or machinery was partially damaged and they had to pay people to go in to clean up the rubble, to maybe move the machines to a different part of the building which hadn't been disturbed so that they could get back to work, that could potentially be covered. But here the machines hadn't been working for a year or two. They hadn't been used for anything for a long time leading up to the fire. The fire had no effect on those machines. And of course, the fire had no effect on whether they could continue to allow contractors to dump rubbish there because the regulatory agencies had already told them they couldn't do that. It all starts with it has to be caused some kind of property damage, some kind of physical damage to the premises and then what happens next. So let me pivot to the expert reports which Mr. Jones talked about because it's not that we accepted one and we ignored another or we cherry picked or did anything like that. The issue with the machinery expert, CMC, the numbers that Mr. Jones is referring to, is CMC went into the buildings and identified all of the machinery that was there, all of the equipment that was there, and then prepared a chart that said, well, for piece of equipment A, here's what it would cost to replace it, here's what the ACV is, and here's what the repair is. And for equipment piece B, here's what the RCV would be, the ACV and the repair. And then they just added up those columns. Mr. Jones saying I'm entitled to $368,000 because that's the ACV for all of the pieces of equipment misses a critical point. Some of that equipment could be repaired. And the issue of repair versus ACV versus RCV is all in the policy and it is the insurance company pays the higher amounts if it can't be repaired. But if it can be repaired, it doesn't pay the higher amounts. It pays to repair it. So what Hallmark did is it looked at the list of all the machinery in consultation with his experts, figured out what can be repaired, what can't be repaired, and then added up the cost of either repair or ACV. It then had to divide it between two different buildings because of the limits. Then it applied deductible and it came up with that $200,000 number. All of that is spelled out in the papers and all of that is spelled out in the reports that we gave Phoenix at the time. And at a minimum, it's fairly debatable. You can argue about whether this piece of machinery could be repaired or couldn't be repaired and so forth. But remember, at the time, Phoenix didn't factually respond to any of our experts. Phoenix didn't say, no, no, the dense-out separator can't be repaired and so therefore we need this higher number or, hey, HSNO, their line items for the state's fair income are wrong because of this, that, or the other. They didn't do anything except say that we're silly and ridiculous and so forth. So it is certainly fairly debatable whether some equipment in building one or two could be repaired. If any of it could be repaired, Walmart pays the repair amount. Don't buy them a whole brand-new piece of equipment, whatever it is. So that's the fourth fairly debatable topic. The fifth fairly debatable topic is this issue about wiring. The figure is $124,800. Mr. Jones suggests that that wiring number is somehow part of the equipment, and it isn't. They're completely separate. What it costs to repair or replace equipment, that's the $200,000. The wiring is an issue of once broken inoperative equipment is repaired or replaced and reinstalled, obviously it has to get wired, right? But the wiring is the last thing you do, not the first thing you do. If there's a bunch of broken items of equipment sitting in the parking lot, the first thing you do is not go out and spend $100,000 to rewire the broken stuff. You wait for it to be repaired or replaced, reinstalled, and then you wire it. As a result, it was at least fairly debatable whether that $124,000 and change was RCV. Remember, under the policy, RCV is not due until after Phoenix actually does the repairs or the $124,800 never came due. Remember, Phoenix never repaired the equipment. It pocketed all this money, but it never repaired the equipment. Phoenix doesn't argue that it was underpaid on this claim. Phoenix argues that we didn't pay it fast enough. So that right there are five fairly debatable issues, and they cover the landscape of everything Mr. Jones has been complaining about. Because they're fairly debatable, we don't even get to the second prong of the two-prong analysis of bad faith. I want to add a couple of others because there's additional freestanding reasons why Hallmark could be found to have been in bad faith and why we asked this court to affirm Judge Jarvie. At the time of the claim, if Phoenix wanted to disagree with any of our expert reports, it had to demonstrate that the experts were, quote, patently wrong. Again, that's the language of the Iowa Supreme Court in Belleville, page 478-479. If it fails to do that, then Phoenix, quote, cannot sustain its burden under the objective prong of the bad faith analysis, closed book. Again, the Iowa Supreme Court in Belleville. So just saying that we're silly or none of that meets their burden of coming forward with actual substantive response showing that the experts were patently wrong. And by the way, even if Phoenix had said something three, four years ago while this claim was unfolding, even if it had some factual or substantive response, that alone doesn't establish bad faith either. Remember, even as Mr. Jones concedes, Hallmark does not have to ignore its own expert report in favor of Phoenix's point of view or simply because different conclusions could be drawn from the same facts. Hallmark is entitled to rely on its experts for its investigation, but not bad faith. I would point out that the Iowa Supreme Court in Sampson gave us actually even another freestanding reason to demonstrate that Phoenix's refusal to provide the requested information. Iowa Supreme Court teaches that an insured who fails to provide the requested information, quote, failed to present sufficient evidence to support a bad faith claim. Sampson in 151-152. So here, again, Phoenix was full of complaints about the questions that we asked. In fact, in his comments, Mr. Jones was angry because he provided some information on December 1st and the expert did not produce their report until December 20th. That's a pretty fast turnaround. He then complains that it took all the way to December 26th for some email to get responded to. There's obviously a weekend and the Christmas holiday in there. As Judge Jarvie commented, usually bad faith complaints are about being paid too slowly, not being paid too quickly. But here, Mr. Jones and Phoenix have multiple times argued we paid too quickly. I would point out that the issue about experts, the two cases that Mr. Jones cites, one of them is a Texas case, the State Farm versus Nicolau. And in that case, the insured actually came forward with evidence showing that the expert was in the pocket of the insurer, would say whatever the insurer wanted. And also, the insured came forward with its own expert report. Here, of course, Phoenix did neither. The Iowa case that he cites, Dunlop versus AIG, the reason the court took issue with reliance on an expert there is the expert changed his mind and wrote a supplemental report about a 2012 injury instead of the 2007 injury. And also, three other experts came forward and the insurer allegedly ignored all of that. Of course, that has the application here because Phoenix didn't do any of that. It was sort of a, you know, here's the haystack, you figure it out. Repeatedly. So, for all those reasons, it can't possibly be bad faith. And finally, I would just observe that Hallmark actually overpaid the claim by about a million dollars. We have the calculations at the appellee's brief, pages 52 through 54. And I would argue that under no stretch of the imagination, been paying more than $2 acting with spite, hate, or ill will sufficient to support a punitive damages claim. I want to stop to see if there's any questions and then I'd have some closing remarks if there are no questions from the panel. It appears that you may close. Thank you. What we have here is at the front end we have a haystack and now we have the cherry picking. Phoenix's argument is we are not going to tell you where you're making mistakes, but you did make mistakes. And the first time you may hear about some of these is four years later when we're before this court of appeal. Obviously, we did everything we could to avoid coming to this point, which is why we overpaid the claim in the hopes of buying the piece and not having to keep litigating. We still have had to litigate this case for the last, I'd have to look at my calendar, but I'm going to guess a year and a half at great cost and expense. Hallmark bent over backwards, gave every benefit of the doubt, overpaid the claim, was transparent in its experts and its reasoning and its data points. And the only thing we got in response from Phoenix is you're silly, you're ridiculous, you figure it out. For all those reasons, we would ask the panel to affirm Judge Jarvie below. Thank you. Very well. Thank you for your argument. Mr. Jones, we'll hear from you in a moment. Thank you, Your Honor. Several things. First of all, this idea that this equipment was not being used for years. They really wanted to have that be true. That was not true. That is at a minimum a that that was not the case. And in fact, I didn't cite it. I don't think I included it in my appendix, but I believe it is in their appendix. There's a January 9th, 2018 email from the adjuster, the Hallmark adjuster, which actually says that Phoenix is entitled to the cost of relocation under the policy. So that argument's wrong. As far as these amounts, this idea that there wasn't any value to this property, I would again cite to the large loss report of Hallmark from October of 2017, which appears in the appendix of 429 through 431. They actually calculate the gross loss as $930,000 at that point in time, including machinery repairs and want to believe that Phoenix, that the people were just terrible business people. This is a case where, you know, this was the second year that Phoenix had coverage with Hallmark. They didn't even file, Phoenix didn't file a single claim during the first year of the policy. It got renewed. Hallmark renewed it. We filed one claim. And then I think they dragged their feet. I mean, the first business income payment of $28,000 came more than six months after the fire. And as I explained in my letter of December 1st, Phoenix by that point in time was in the position that it couldn't make its, it couldn't pay its employees. It lost customers because it took so long to get back up and running. And it lost its equipment. That's all was pointed out to to Hallmark. And yet they continue to come up with additional reasons to try to delay this because they didn't want us to replace this equipment because they have a financial benefit by not having, if we don't, are unable to replace the equipment. Thank you. Very well. Thank you for your argument. Thank you to both counsel. The case is submitted and the court will file an opinion in due course. Counselor.